BRYAN, Judge.
 

 South Highland Limited Partnership (“the landlord”) appeals from a summary judgment in favor of Southern Family Markets of Clanton, LLC (“the tenant”). We affirm.
 

 On October 27, 2007, the landlord sued the tenant, stating a claim that the tenant had breached a lease dated October 31, 1987 (“the 1987 lease”).
 
 [1]
 
 The landlord alleged that, in the 1987 lease, Joseph S. Bruno and Theresa L. Bruno had leased a building in a shopping center in Clanton (“the leased premises”) to Bruno’s, Inc. (“Bruno’s”), for the operation of a Food Fair grocery store; that the landlord had succeeded to the interests of Joseph S. Bruno and Theresa L. Bruno in the 1987 lease; that Bruno’s had assigned its interest in the lease to the tenant in 2005; and that, in 2006, the tenant had breached the 1987 lease by vacating the leased premises and ceasing to pay rent and other charges due under the 1987 lease.
 

 Answering, the tenant denied that it had breached the 1987 lease. Thereafter, it moved for a summary judgment. In support of its motion, the tenant argued that the primary term of the 1987 lease had expired on May 31, 2003; that Bruno’s had not exercised the option granted it in the 1987 lease to extend its term for a five-year period expiring on May 31, 2008, because, the tenant said, the 1987 lease provided that Bruno’s was to exercise that option by sending the landlord written notice that it was exercising its option by certified mail eight months before the expiration of the primary term of the 1987 lease on May 31, 2008, and Bruno’s had not done so; that the 1987 lease contained a provision titled “Holding Over” that provided that, “[i]n the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the demised premises after the expiration of the lease term, it shall so remain as a tenant from month to month” and that Bruno’s holding over after the expiration of the primary term of the 1987 lease had been on a month-to-month basis pursuant to that provision of the 1987 lease; that Bruno’s assignment of its interest in the 1987 lease to the tenant in 2005 constituted the assignment of its interest in a month-to-month tenancy; and that the tenant had not breached the 1987 lease in 2006 when it vacated the leased premises and ceased paying the rent and other charges due under the 1987 lease because it had given the landlord the notice required by the 1987 lease to terminate its month-to-month tenancy before vacating the leased premis
 
 *938
 
 es and ceasing to pay the rent and other charges due under the 1987 lease.
 

 Opposing the tenant’s motion, the landlord argued that the tenant was not entitled to a summary judgment because, the landlord said, a genuine issue of material fact existed regarding whether Bruno’s had exercised its option to extend the 1987 lease until May 31, 2008. The landlord argued that, because the 1987 lease stated that Bruno’s option to extend the 1987 lease
 
 “may
 
 be exercised by the Tenant giving to the Landlord a notice in writing at least eight (8) months before the expiration of the then current term” (emphasis added), rather than stating that it
 
 must
 
 be exercised in that manner, a genuine issue of material fact existed regarding whether Bruno’s had exercised its option to extend that 1987 lease in ways other than by a written notice sent by certified mail. The landlord further argued that testimony by its agent Scott Stanford established a genuine issue of material fact regarding whether Bruno’s, through its agent, Mark James, had exercised the option orally in a meeting between Stanford and James in April 2002. The landlord also argued that Stanford’s testimony and an internal Bruno’s e-mail that had been sent to the landlord by facsimile transmission in July 2002 established a genuine issue of material fact regarding whether Bruno’s had exercised its option to extend the 1987 lease by sending the landlord a copy of that internal e-mail. The landlord also argued that evidence establishing that Bruno’s had remained in possession of the leased premises after the expiration of the primary term of the 1987 lease and had continued to pay rent in the amount of $4.75 per square foot, the same rent it had paid before the expiration of the primary term of the 1987 lease, established the existence of a genuine issue of material fact regarding whether that conduct constituted an implied exercise of its option to extend the 1987 lease by Bruno’s. Finally, the landlord argued that evidence establishing that attorneys representing Bruno’s with respect to Bruno’s assignment of its interest in the 1987 lease to the tenant had sent a document titled “Landlord Estoppel Certificate” to the landlord for it to sign in 2005 established a genuine issue of material fact regarding whether Bruno’s had exercised its option to extend the 1987 lease.
 

 With respect to his oral discussion with James in April 2002, Stanford testified:
 

 “[THE TENANT’S COUNSEL] Q. Okay. So you met, talked about an extension in April of 2002 with Mark James, right?
 

 “A. Yes.
 

 “Q During that meeting in April of 2002 with Mark James, did he extend or attempt to extend the lease terms on behalf of Bruno’s, Inc.?
 

 “A. Yes.
 

 “Q.
 
 So, it’s your position here today that in that meeting in ApHl of 2002, Bruno’s, Inc., through its representative Mark James, agreed to extend the original tei"m of the lease; is that fair?
 

 “A.
 
 Yes, as I recall.
 

 “Q. Now, as I’m asking you these questions about the April face-to-face meeting with Mark James, I know you are referring to some notes to help, refresh your memory, right?
 

 “A Correct.
 

 “Q. And I’ve actually got a copy of those notes. And I’m going to mark them as Exhibit Number 12 to your deposition.
 

 “(Defendant’s Exhibit No. 12 was marked for identification).
 

 “And I’ve asked you whether or not Mark James, as the representative from Bruno’s, Inc., agreed to extend on behalf of Bruno’s, Inc., their term during that April 2002 meeting and you told me that he did, right?
 

 
 *939
 
 “A. Right.
 

 “Q.
 
 Now, you looked at your notes before you answered that question. What part of your notes here that I have got now attached as Exhibit
 
 12—
 

 “A.
 
 The third bullet point.
 

 “Q. Okay. And that bullet point I’m going to read it into the record. And if I read it wrong, you can tell me, okay?
 

 “It says,
 
 ‘Met with Mark on 4.-23-02. Per Mark, they plan on renewing, no expansion, ivill upgrade to a Food World. Landlord to upgrade the entire center at that time. Rent to remain at $4-75 per square foot, and they would like us to pursue obtaining a traffic light with all parties contributing to the cost.’
 
 That’s what that says?
 

 “A.
 
 Correct.
 

 “Q. Tell me a little bit more about what you remember from this April 2002 face-to-face meeting, and particularly what Mark James and you, as a representative from South Highland, discussed.
 

 “A. I really don’t recall. It involved discussing where we were with [James’s predecessor], where the process was, just general introduction and then discussing further, you know, reaching a conclusion on what they would be willing to do.
 

 “Q Now, it says here on your notes, ‘They plan on renewing.’ You see that, right?
 

 “A. Uh-huh.
 

 “Q. And they, I assume, is Bruno’s, Inc., right.
 

 “A. Correct.
 

 “Q So, per your notes here that we’ve attached as Exhibit Number 12, it seems as if Bruno’s, Inc., was planning on renewing, right?
 

 “A. Yes.
 

 “Q. Okay, and, in fact, Bruno’s, Inc., communicated to you in this face-to-face meeting in April of 2002 that it was planning to renew, right?
 

 “A Right.
 

 [[Image here]]
 

 “Q Did Mark James at the April 2002 face-to-face meeting sign any document on behalf of Bruno’s, Inc.?
 

 “A. No.
 

 “Q. At the April 2002 face-to-face meeting with Mark James as a representative for Bruno’s, Inc., did he provide to you, as a representative for [the landlord], anything in writing regarding Bruno’s plan to extend the lease?
 

 “A. No.
 

 “Q. In other words, he just told you ... at that meeting that Bruno’s, Inc., was planning to renew or extend their lease, right?
 

 “A. Correct.”
 

 (Emphasis added.)
 

 Stanford testified that, after his discussion with James in April 2002, he had sent James e-mails on June 12 and July 2, 2002. The June 12, 2002, e-mail stated:
 

 “Here’s a summary of our recent discussions regarding the lease renewal in Clanton, AL.
 

 “CVS has recently renewed their lease for the same location in the center. We are talking to them about sliding down to the end cap, which would give them a drive-thru. It would be very helpful to this process to already have a renewal in place for Food Fair/Food World.
 
 9/30/02 is the required date to officially notify us of your intent to renew. We would ask you to consider signing the
 
 5-i/ear
 
 renewal as soon as possible.
 

 “At the time of your upgrade to Food World, we will commit to upgrading the center in all ways you have requested:
 

 “fresh coat of paint across the front
 

 
 *940
 
 “upgrade parking lot lighting
 

 “painting main sign out front
 

 “note that the parking lot was redone in 2000, including repair of all base-failed areas, a new binder coat of asphalt and restriping.
 

 “Either at the same time as the upgrade or in the months following, we are planning on putting on a new roof. We are considering a sprayed polyurethane foam roof system. According to Frank Welch at Perimeter Roofing, a Baldwin County study showed this roof system generated 25% reduction in energy costs.
 

 “For the past year, we have been in the process of obtaining approval of a traffic light at the intersection in front of the center. We have secured a City Council Resolution that states their approval and willingness to cover all maintenance and utilities associated with the light. The [Department of Transportation] has preliminarily approved the project, but will not give final approval until a site plan and installation specs have been reviewed.
 

 “In exchange for the above contributions to the center, we need an increase in the base rent for the next five years. For the past 15 years, Bruno’s has enjoyed a flat rate of $4.75 per square foot. The percentage rent provision in the lease is irrelevant due to extremely high sales breakpoint for this market. We need for the base rent to be increased to $5.50 for the renewal period.
 

 “Let me know if you have any questions. We are excited about the future of [the] center and look forward to moving ahead with the project.”
 

 (Emphasis added.)
 

 The July 2, 2002, e-mail stated:
 

 “I wanted to confirm our discussion last week about Clanton. Please reply back to this and let me know if it agrees with your understanding of both our commitments.
 

 “1) Bruno’s will convert the Food Fair to a Food World during 2002.
 

 “2) Rental rate will increase to $5 per square foot beginning 8/1/02.
 

 “3) 5-year renewal option has been elected for the period June 1, 2003 to May 31, 2008.
 

 “4) Three 5-year renewal options remain.
 

 “5)
 
 Bruno’s will reimburse [landlord] for one-third of the cost for the installation of the traffic light. If the estimate of one-third exceeds $15,000, then Bruno’s reserves the right to reconsider before any work is performed.
 

 “6) [Landlord] will paint front facade, upgrade parking lot lighting, and paint main sign out front.
 

 “Feel free to call me....”
 

 Stanford testified that he did not receive an immediate response to his June 12 and July 2, 2002, e-mails; however, he testified that sometime after July 17, 2002, he received by facsimile transmission a copy of a an internal e-mail that James had sent to Mike Conley, Bruno’s assistant general counsel, and another agent of Bruno’s on July 17, 2002 (“James’s July 17 internal email”). James’s July 17 internal e-mail stated:
 

 “We have reached an agreement with the Landlord of [the Food Fair store in Clanton] for a Lease Extension Agreement along the following terms and conditions:
 

 “A) The Lease will be extended until May 31, 2008. Current expiration is 5/31/03. Three five-year options will remain.
 

 “B) Rent will increase to $159,000/an-nually ($5 [per square foot]) upon execution of the Agreement. Current
 
 *941
 
 rent is $151,050 ($4.75 [per square foot]).
 

 “Q Prior to 12/31/02, Landlord will (1) re-roof the Food Fair facility; (2) paint the facade of the shopping center; (3) upgrade the parking lot lighting; (4) paint the shopping center pylon sign.
 

 “D) Upon installation of a traffic signal in front the shopping center, Bruno’s will reimburse Landlord 1/3 of the cost of the signal, not to exceed $15,000.
 

 “E) Prior to January 31, 2003, Bruno’s will commence with the re-formatting [of] the Food Fair to a Food World.
 

 “Please provide the Lease Extension Agreement at your convenience. Let me know if you have any questions or if I can provide any additional information.”
 

 Regarding James’s July 17 internal email, Stanford testified:
 

 “[THE TENANT’S COUNSEL] Q. And in [James’s July 17 internal] e-mail here it says, ‘We have reached an agreement with the landlord of the above referenced store for a lease extension agreement along the following terms and conditions.’ You see that, right? “A. Uh-huh.
 

 “Q. And then it goes on to set out what Bruno’s, Inc., believed to be the terms of the extension, right?
 

 “A. Right.
 

 “Q.
 
 And you understood, as a representative of [the landlord], when you received [James’s July 17 internal] email that this was Bruno’s understanding of the terms of the extension, right?
 
 “A.
 
 Yes.
 

 “Q.
 
 And if you compare Defendant’s Exhibit Number 15, which is [Stanford’s July 2 e-mail to James], setting out the terms of the potential extension, to Exhibit Number 16, which is [James’s July 17 internal e-mail] that you received by fax from Bruno’s, you know that these are two different terms?
 

 “A. Yeah, they are slightly different in certain aspects, yeah.
 

 “Q. Well, for instance, in your proposal to Bruno’s, Inc., which is Exhibit Number 15, you have included at clause five a statement that says, ‘Bruno’s will reimburse [landlord] for one-third of the cost for the installation of the traffic light. If the estimate of one-third exceeds $15,000, then Bruno’s reserves the right to reconsider before any work is performed.’
 

 “And that was part of your proposal to Bruno’s, Inc., right?
 

 “A. Right.
 

 “Q. But what you actually got in turn from Bruno’s, Inc., in this e-mail that was originally drafted by Mark James at Bruno’s, Inc., is, ‘Prior to December 31, 2002 landlord will one, reroof the Food Fair facility; two, paint the facade of the shopping center; three, upgrade the parking lot lighting; four, paint the shopping center pylon sign,’ right?
 

 “A. No. Actually the item that you’re comparing to would be item D, ‘Upon installation of a traffic signal in front of the shopping center Bruno’s will reimburse landlord one-third of the cost of the signal, not to exceed $15,000.’
 

 “It looks like the only thing that was left out was if the work exceeded $15,000 that they reserved the right.
 

 “Q. Okay. So, it looks like actually— and I apologize. You definitely know better about these documents than me.
 

 “But it looks like the clause D of [James’s July 17 internal e-mail] is actually in response to your clause five from [Stanford’s July 2 e-mail], right?
 

 “A. Correct.
 

 
 *942
 
 “Q. And you would agree with me, as a representative of [the landlord], that those two clauses do differ, right?
 

 “A. And the one you read, Item C, actually looks like it corresponds more to number 6.
 

 “Q. Okay. And in looking at Item C in [James’s July 17 internal e-mail] and comparing that to item six in [Stanford’s July 2 e-mail], we understand that Bruno’s, Inc., has actually imposed a different term with regard to the improvements than you proposed to them, right?
 

 “A. Right. And that was really where this — as far as it got before, you know— they were imposing that we do all of our work before the end of '02. And we were wanting to do it at the same time. Because we didn’t want them to delay doing an upgrade to a Food World for two years, you know.
 

 “Q. I understand.
 

 “A. We were willing to do that, but we wanted them to do their part.
 
 And one thing I would note, you see the two checkmarks next to A and B?
 

 “Q.
 
 Ido.
 

 “A.
 
 Those were on the e-mail that came indicating that
 
 — our
 
 assumption was
 
 — those
 
 were what we had agreed to. And the other items were still yet to be, you know
 
 — still
 
 negotiating was still going on.
 

 “Q.
 
 But you, as a representative of [the landlord], understood that Bruno’s, Inc., was intending to require [the landlord] to address what’s set out of Item C of [James’s July 17 internal e-mail] before they would actually formally agree to extend, right?
 

 “A.
 
 Well, again, it was more of the bundle of you know, items here. You know, we felt like we had an agreement that we would do these improvements that they listed. And we didn’t have any issues with those, that list corresponding to our list. But, again, we wanted them to go to the Food World. They weren’t willing [to] go, you know, to go there.
 

 “And so, yes, from their perspective, we weren’t in agreement on those issues, yes.
 

 “Q.
 
 So, you weren’t in agreement on the improvements by the terms proposed by Bruno’s, Inc., correct?
 

 “A.
 
 Right, right.
 

 “Q.
 
 In other words, [the landlord] did not agree to make the improvements per the terms proposed by Bruno’s, Inc., right?
 

 “A. Right. The timing.
 

 “Q.
 
 The timing of them at least, right?
 

 “A. Yeah.
 

 “Q.
 
 So, there was no meeting of the minds between Bruno’s, Inc., and [the landlord] regarding at least the timing of the improvements required by Bruno’s, Inc., right?
 

 “A. Yes, not in writing. It had not occurred.
 

 “Q.
 
 Well, what writing you did actually get proposed something different than what you had proposed to Bruno’s, Inc., right?
 

 “A. Yes. And my understanding was that what I proposed was a reflection of what Mark James and I had agreed to. What came back was they wanted us to do our part earlier.
 

 “Q.
 
 But it did actually come back from Bruno’s, Inc., that they wanted something different than you remembered, light?
 

 “A. Right.
 

 “Q.
 
 And you knew, as a representative of [the landlord], that Bruno’s, Inc., in fact, did want something different than you remembered, right?
 

 “A. Yes. As to timing, right.
 

 
 *943
 
 “Q.
 
 Did [the landlord] ever agree to at least the timing of the improvements proposed by Bruno’s, Inc. ?
 

 “A.
 
 No.”
 

 (Emphasis added.)
 

 Stanford testified that, on September 16, 2002, Conley sent Stanford an e-mail and a draft of a document titled “First Amendment to Lease.” Regarding that e-mail and the draft of the First Amendment to Lease that accompanied it, Stanford testified:
 

 “[THE TENANT’S COUNSEL] Q. I’m going to mark as Defendant’s Exhibit 17 what appears to be a fax from Bruno’s to you, Mr. Stanford, as a representative of [the landlord]. And there is a bundle of documents that are attached to the fax. And I would ask you to take a look at those for me.
 

 “(Defendant’s Exhibit No. 17 was marked for identification).
 

 “A. Okay.
 

 “Q. Do you recall having received this fax from Mike Conley at Bruno’s, Inc.? “A. Yes.
 

 “Q. And you understood that as part of this fax Bruno’s, Inc., was proposing an actual written amendment to the lease, right?
 

 “A. Right. Which is what we were thinking would occur.
 

 “Q. Right. And, in fact, Bruno’s, Inc., by the words and terms of this proposed amendment, had included some detail about the improvements it wanted at the property, right?
 

 “A. Correct.
 

 “Q. Did you have an opportunity to review these proposed terms of the extension?
 

 “A. Yes.
 

 “Q. Are these your notes here handwritten on this document?
 

 “A. Yes, I believe so.
 

 “Q. Okay. What is it that you were reviewing this document to determine? “A. If the amendment proposed was acceptable to [the landlord],
 

 “Q. Was
 
 it acceptable to [the landlord]?
 

 “A.
 
 No.
 

 “Q. And, in fact, as a result [the landlord] never agreed to these proposed terms, right?
 

 “A. Well, there were certain of the terms that we did not agree to. Which, again, we talked about primarily was the timing of the upgrade and the timing of our improvements.
 

 “Q. Did Bruno’s, Inc., ever execute in writing this amendment to the lease? “A. No, not to my knowledge.
 

 “Q. Again, you understood, as a representative of [the landlord], in receiving this fax and the draft of the first amendment to the lease that Bruno’s, Inc., at least wanted to have in writing the extension of this lease, right?
 

 “A. Well, no. I knew that they wanted to memorialize accurately all of the improvements that they wanted us to do and that they were agreeing to do, and the rent increase and the traffic light.
 

 “Q.
 
 In fact, they wanted those improvements as part of their intent to exercise their right to extend the lease?
 

 “A.
 
 Well, again, that’s the dispute, I guess. You know, they were, you know, putting those items into an amendment, which we think is the proper form, and knew that had to happen. But I think the issue is just a pure extension of the old lease versus changing the old lease by the things in this amendment. You know, that is the distinction that I think we’re on different sides of.
 

 “Q.
 
 Okay, So, you’re calling an extension, as a representative of [the landlord], an extension of the lease accord
 
 
 *944
 

 ing to the original terms of the lease, right?
 

 “A.
 
 Yes, I believe so.
 

 “Q.
 
 In other words, Bruno’s, Inc., is leasing this property. And by extending it, is agreeing to continue to stay and pay rent according to the same terms that it had always been a tenant at the Clanton property, right?
 

 “A.
 
 Yeah.
 

 “Q. But what you’re telling me now is, you, as a representative of [the landlord], understood that the word ‘renewal’ meant something different, and what you thought renewal meant was that there would be a change in the terms of the lease?
 

 “A. I wouldn’t go there. I think the word ‘extension’ and ‘renewal, I think that probably is interchangeable. And, you know, they have not been used consistently. But I think they’re the same thing.
 

 “Q. Well, let’s go back to [James’s July 17 internal e-mail].
 

 “A. Okay.
 

 “Q. And look with me to the very top of that e-mail which, again, is an internal e-mail from Mark James to Mike Conley at Bruno’s, right?
 

 “A. Right.
 

 “Q. And, in fact, what this e-mail that was forwarded to you as a representative of [the landlord] says is that this document is referencing a lease extension agreement, right?
 

 “A. Uh-huh.
 

 “Q. And you can see that from reading this e-mail—
 

 “A. Right.
 

 “Q. —that’s part of your deposition as Exhibit 16, right?
 

 “A. Right.
 

 “Q. So, in reading that, as a representative of [the landlord], you understand that Bruno’s believes these are the terms of the actual extension?
 

 “A. Well, you know—
 

 “Q. Right?
 

 “A. Mark James wrote this. And it looks like their inside counsel put it in the form of an amendment, which we think is the proper form. He refers to it like you just pointed out. But, you know, I don’t know what that necessarily means.
 

 “Q. Well, to me it means that you received this e-mail from Bruno’s, Inc., right?
 

 “A. Right.
 

 “Q.
 
 And in reading this e-mail, you know that Mark James at Bruno’s, Inc., believes these terms to be part of an actual extension, right? I mean, that’s what he said?
 

 “A.
 
 He had it all bundled together, right.
 

 “Q.
 
 I mean, that’s what this document says, ‘These are the terms of the extension, ’ right?
 

 “A.
 
 Uh-huh.
 

 “Q. And so by reading that as the [landlord’s] representative, you know that Mark James at Bruno’s, Inc., who is your primary contact at Bruno’s, believes these are the terms of the extension, right?
 

 “A. Right. And that—
 

 “Q. There is no confusion on that.
 

 “[THE LANDLORD’S COUNSEL]: Well, you’ve interrupted him and I object to that. Let’s read it all back.
 

 “[THE TENANT’S COUNSEL]: Read what all back?
 

 “[THE LANDLORD’S COUNSEL]: He was right in the middle of answering and you jumped on his answer. I would like to read back the last question and have him answer.
 

 “(RECORD READ).
 

 
 *945
 
 “Q. Is there something else you want to add to that?
 

 “A. I’m not sure. Do you want to ask me the question again?
 

 “Q. I don’t. I have already gotten your answer. I think [the landlord’s counsel] thought you had something else to say.
 

 “A. I guess — I think the only thing I was about to say was that we were asking, you know, for Mike to hustle up, let’s get this done.
 
 Again, we were trying to use that notice date to get them to get it done.
 

 “Q.
 
 And the notice date you’re talking about is the eight
 
 months—
 

 “A.
 
 Right.
 

 “Q.
 
 —that
 
 pre-date—
 

 “A.
 
 Right.
 

 “Q.
 
 —the expiration of the primary term of the lease, right ?
 

 “A. That’s correct.
 

 “Q.
 
 And that is per the terms of the original lease as related to the extension.
 

 “A.
 
 Yes, I think so.
 

 “Q. Well, we can look back at the document. But what it says is, that the tenant — it may provide notice in writing eight months prior to the expiration of the primary term, right?
 

 “A. Yes.
 

 “Q. And so that’s contemplating a deadline relating to the extension, right? “A.
 
 Yes. And our understanding was that this was supplied to us to show us that and to supply that written requirement from their perspective.
 

 “Q. I understand.
 

 “A.
 
 Now, again, we felt like the extension, pure, simple, vanilla extension, we had been relying on that for months.
 

 “Q.
 
 And, again, that was a verbal reliance, correct?
 

 “A.
 
 And we had all of these bundle of issues that we were trying to accomplish, you know, and we wanted to, you know, get it done.
 

 “(BREAK TAKEN).
 

 “Q. (By [the tenant’s counsel) Before the quick break, I was asking you a question about Exhibit Number 17, which was a fax I believe you received from Bruno’s, Inc., correct?
 

 “A. Correct.
 

 “Q. And it is actually a proposed first amendment to the lease, right?
 

 “A. Correct.
 

 “Q. And there is an exhibit that is attached to this first amendment to the lease that is Exhibit A. Do you see that?
 

 “A. Yes.
 

 “Q. And in this exhibit, it appears as though Bruno’s, Inc., is proposing to have South Highland, as the landlord, complete the following improvements prior to December 31, 2002; is that right?
 

 “A. Yes.
 

 “Q. And there are several things listed here one through five. But in summary, it’s replacing the roof, painting the shopping center facade, upgrading the shopping center lot lighting, repairing and repaint the shopping center lot light poles, and patching all pot holes and restriping the parking lot, right?
 

 “A. Right.
 

 “Q. Did [the landlord], in fact, address these items prior to December 31, 2002?
 

 “A. No. Now, there may have been some things related to the normal repairs and maintenance in the lease not improved like they are contemplating. I know these big items—
 

 “Q. It’s [the landlord’s] position that they didn’t intend to comply with the terms proposed here by Bruno’s, Inc., right?
 

 
 *946
 
 “A. Right.”
 

 (Emphasis added.)
 

 Stanford testified that, in April 2003, Steve Taylor, Bruno’s director of real estate, had indicated to Stanford in a telephone conversation that it was Bruno’s position that it had not exercised its option to extend the 1987 lease because it had not sent the landlord written notice that Bruno’s was exercising its option. In response, Stanford sent Taylor a letter in April 2003. In pertinent part, that letter stated:
 

 “Under the [1987] lease, the base term expires May 31, 2003 and [Bruno’s] had four (4) five-year renewal options.
 
 To exercise the renewal option under the [1987] lease, [Bruno’s] must notify the landlord in writing at least eight months before the expiration of the [1987] lease. This was done in July of 2002 by fax.
 
 At that time, Bruno’s requested additional improvements to be made by the landlord in conjunction with an upgrade from a Food Fair to a Food World. Mike Conley prepared an amendment to the lease to incorporate all changes to the [1987] lease agreed to by both parties. At this point, the lease was renewed and the amendment was in process.
 

 “For the past nine months, we have acted and relied on this renewal. Recent conversations have indicated the need to clarify the terms of the lease renewal.
 

 “Lease extended to May 31, 2008. “Rent will increase to $159,000 per year ($5/sf].
 

 “Upon installation of a traffic signal in front of the shopping center, Bruno’s will reimburse Landlord one-third of the cost, not to exceed $15,000.
 

 “Although both parties agreed to make the improvements for the Food World upgrade, the timing of those improvements is still under discussion causing the amendment to remain in draft form.
 

 “We would like to get reach an agreement regarding the timing of the improvements as soon as possible. Please call me to discuss.”
 

 (Emphasis added.)
 

 On June 5, 2003, Conley sent Stanford a letter responding to Stanford’s April 17, 2003, letter to Taylor. Conley’s letter stated:
 

 “Your letter dated April 21, 2003 addressed to Mr. Steve Taylor with a copy to the undersigned has been reviewed and discussed by the management of Bruno’s. In your letter, it was asserted that ‘[Bruno’s] exercised the first option before September 30, 2002 by fax.’ Please know that Bruno’s respectfully disagrees with your assertion as it is the position of Bruno’s that the fax you have referred to was an internal memorandum from Mr. James to the undersigned setting out recently negotiated additional terms and conditions to be inserted in a lease amendment. As such, the fax was not an exercise of an option privilege under the terms and conditions of the [1987] Lease. At the present, Bruno’s believes that [the ‘Hold Over’ provision] of the [1987] Lease governs.
 

 “I would ask that you contact Mr. Steve Taylor in order to determine how [the landlord]
 
 and
 
 Bruno’s might move forward in resolving all outstanding issues. Please know that nothing herein might be deemed or construed as a waiver of the rights and remedies available to Bruno’s under the terms and conditions of the [1987] Lease at law and in equity. This is an offer of compromise.”
 

 Stanford testified that, after the expiration of the primary term of the 1987 lease, Bruno’s continued to pay rent in the amount of $4.75 per square foot, the same
 
 *947
 
 rent it had paid before the expiration of the primary term of the 1987 lease. Stanford testified that, in October 2003, the landlord began seeking another entity to lease the leased premises because Bruno’s would not confirm that it had exercised its option to extend the 1987 lease; however, the landlord was not successful in finding another entity to lease the leased premises. Stanford testified that, in May 2005, the landlord learned that Bruno’s was going to assign its interest in the 1987 lease to the tenant. Stanford testified that the landlord did not know whether Bruno’s was telling the tenant that Bruno’s had exercised its option to extend the 1987 lease or that its tenancy had become a month-to-month one pursuant to the “Holding Over” provision. Stanford further testified:
 

 “[THE TENANT’S COUNSEL] Q. Based on that knowledge that it was possible that [the tenant] would have assumed this lease from Bruno’s was a month to month, what did [the landlord] do to make sure or at least try and communicate that [the landlord] believed the lease was for a term longer than that?
 

 “A. Well, again, this is from memory here. But as I recall, we didn’t know what [the tenant] understood about the lease. Again, we would imagine it was whatever [Bruno’s] represented to them. So, what we didn’t want to do if, in fact, they believed it was a five-year renewal, we didn’t want to call them and say, hey, can you confirm the fact or do you think we are in a month to month?
 

 “We didn’t want to go there. So, we felt like just being silent was the way to go. And as I alluded to in this e-mail we just discussed, Exhibit 28, that we were not sure if they would be interested in an upgrade proposal.
 

 “Q. So, in other words, [the landlord] was of the opinion that it was better to remain silent in the hopes that [the ten-
 

 ant] would stay in the property, whether they believed the lease to be month to month or if the lease was set to expire in 2008, right?
 

 “A. Yes. We didn’t see the advantage of raising that issue.
 

 “Q. And, in fact, it was more advantageous to [the landlord] to remain quiet and to not alert [the tenant] to the fact that [the landlord] believed that the lease was set to expire in 2008, right? “A. Yes.”
 

 Stanford testified that the landlord subsequently received a document titled “Landlord Estoppel Certificate” from attorneys representing Bruno’s with respect to the assignment of its interest in the 1987 lease to the tenant. In pertinent part, the Landlord Estoppel Certificate, which is drafted as a certification by the landlord regarding the 1987 lease and is addressed to Bruno’s, stated:
 

 “In order to induce [the tenant] to enter into certain purchase arrangements and lease assignments with [Bruno’s], Landlord hereby certifies
 
 as follows:
 

 [[Image here]]
 

 “(c) The term of the Lease commenced April 1, 1983 and
 
 the current term of the Lease is scheduled to expire on May 31,
 
 2008....
 

 [[Image here]]
 

 “(n) The information herein set forth herein [sic] is correct, or exceptions have been marked and initialed.
 
 The contents of this certificate shall be binding upon the party who executes it.
 
 This certificate may be relied on by the person to whom this certificate is addressed, by the assignee or designee of such person, by [Bruno’s], and by [the tenant] and its affiliates.”
 

 (Emphasis added.) The landlord signed the Landlord Estoppel Certificate and re
 
 *948
 
 turned it to the attorneys representing Bruno’s.
 

 Following a hearing regarding the tenant’s summary-judgment motion, the trial court entered a judgment granting the tenant’s summary-judgment motion. The landlord then timely appealed to the supreme court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975.
 

 “This Court’s review of a summary judgment is de novo.
 
 Williams v. State Farm Mut. Auto. Ins. Co.,
 
 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.;
 
 Blue Cross & Blue Shield of Alabama v. Hodurski,
 
 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant.
 
 Wilson v. Brown,
 
 496 So.2d 756, 758 (Ala. 1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact.
 
 Bass v. SouthTrust Bank of Baldwin County,
 
 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12. ‘[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’
 
 West v. Founders Life Assur. Co. of Fla.,
 
 547 So.2d 870, 871 (Ala.1989).”
 

 Dow v. Alabama Democratic Party,
 
 897 So.2d 1035, 1038-39 (Ala.2004).
 

 On appeal, the landlord argues, as it did before the trial court, that Stanford’s testimony regarding his meeting with James in April 2002 established a genuine issue of material fact regarding whether James, acting on behalf of Bruno’s, orally exercised Bruno’s option to extend the 1987 lease. We find no merit in that argument. In pertinent part, Stanford’s notes regarding that meeting state:
 

 “Met with Mark on 4-23-02. Per Mark, they plan on renewing, no expansion, will upgrade to a Food World. Landlord to upgrade the entire center at that time. Rent to remain at $4.75 per square foot, and they would like us to pursue obtaining a traffic light with all parties contributing to the cost.”
 

 Those notes indicate that James communicated to Stanford that Bruno’s planned to exercise its option in the future if certain conditions were met such as the landlord’s agreeing that the rent would remain at $4.75 per square foot and the parties’ obtaining a traffic light. The conclusion that James did not exercise the option orally on April 23, 2002, is corroborated by Stanford’s June 12, 2002, e-mail to James in which he stated that “9/30/02 is the required date to officially notify us of your intent to renew. We would ask you to consider signing the 5-year renewal as soon as possible.”
 

 The landlord also argues, as it did before the trial court, that James’s July 17 internal e-mail established a genuine issue of material fact regarding whether that email constituted Bruno’s exercise of its option to extend the 1987 lease. James’s July 17 internal e-mail stated:
 

 “We have reached an agreement with the Landlord of [the Food Fair store in Clanton] for a Lease Extension Agreement along the following terms and conditions:
 

 “A) The Lease will be extended until May 31, 2008. Current expiration is
 
 *949
 
 5/31/OB. Three five-year options will remain.
 

 “B) Rent will increase to $159,000/an-nually ($5 [per square foot]) upon execution of the Agreement. Current rent is $151,050 ($4.75 [per square foot]).
 

 “C) Prior to 12/31/02, Landlord will (1) re-roof the Food Fair facility; (2) paint the facade of the shopping center; (3) upgrade the parking lot lighting; (4) paint the shopping center pylon sign.
 

 “D) Upon installation of a traffic signal in front the shopping center, Bruno’s will reimburse Landlord 1/3 of the cost of the signal, not to exceed $15,000.
 

 “E) Prior to January 31, 2003, Bruno’s will commence with the re-formatting [of] the Food Fair to a Food World.
 

 “Please provide the Lease Extension Agreement at your convenience. Let me know if you have any questions or if I can provide any additional information.”
 

 James’s July 17 internal e-mail plainly indicates that Bruno’s agreement to extend the 1987 lease was conditioned on the landlord’s agreement that “[p]rior to 12/31/02, Landlord will (1) re-roof the Food Fair facility; (2) paint the facade of the shopping center; (3) upgrade the parking lot lighting; (4) paint the shopping center pylon sign,” and Stanford testified that the landlord never agreed to do that work before December 31, 2002. Therefore, we find no merit in the landlord’s argument that it established a genuine issue of material fact regarding whether James’s July 17 internal e-mail constituted Bruno’s exercise of its option to extend the 1987 lease.
 

 Citing
 
 McIntyre v. Coker,
 
 274 Ala. 457, 150 So.2d 220 (1963), the landlord argues, as it did in the trial court, that evidence establishing that Bruno’s remained in possession of the leased premises after the expiration of the primary term of the 1987 lease and continued to pay rent in the amount of $4.75 per square foot, the same rent it had paid before the expiration of the primary term of the 1987 lease, established the existence of a genuine issue of material fact regarding whether that conduct constituted an implied exercise of its option to extend the 1987 lease by Bruno’s. In
 
 McIntyre v. Coker,
 
 the supreme court stated that
 

 “a lessee who enters into possession of the demised premises under a lease for a fixed term, with the privilege of renewing it by giving written notice to the lessor, and continues in possession after the fixed term has expired, paying the rent therefor as it becomes due, thereby elects to exercise the option for a renewal, although no written notice was given. In such a lease the requirement of a written notice may be waived by the parties, and a waiver may be implied when the lessee remains in possession and pays the rent to the lessor.”
 

 274 Ala. at 461,150 So.2d at 224.
 

 However, the opinion in
 
 McIntyre v. Coker
 
 does not refer to a provision in the leases at issue in that case that was comparable to the “Holding Over” provision in the 1987 lease. The “Holding Over” provision in the 1987 lease stated:
 

 “In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the demised premises after the expiration of the lease term, it shall so remain as a tenant from month to month and all provisions of this Lease applicable to such tenancy shall remain in full force and effect.”
 

 Because of the presence of the “Holding Over” provision in the 1987 lease, we conclude that the facts of the case now before us are distinguishable from the facts in
 
 *950
 

 McIntyre v. Coker.
 
 We conclude that, because of the presence of the “Holding Over” provision in the 1987 lease, Bruno’s remaining in possession of the leased premises after the expiration of the 1987 lease and its paying the same rent it had paid during the primary term of the 1987 lease did not establish a genuine issue of material fact regarding whether that conduct constituted an implied exercise of its option to extend the 1987 lease.
 

 Finally, the landlord argues, as it did in the trial court, that the Landlord Estoppel Certifícate established the existence of a genuine issue of material fact regarding whether Bruno’s had exercised its option to extend the 1987 lease. Although the Landlord Estoppel Certificate was not drafted until 2005, well after the expiration of the primary term of the 1987 lease, and although it does not purport to contain a representation by Bruno’s, the landlord argues that Bruno’s should be deemed to have adopted the landlord’s representation in the Landlord Estoppel Certificate that “the current term of the Lease is scheduled to expire on May 31, 2008” by virtue of Rule 801(d)(2)(B), Ala. R. Evid. Rule 801(d)(2)(B) provides:
 

 “(d) Statements That Are Not Hearsay. A statement is not hearsay if—
 

 [[Image here]]
 

 “(2)
 
 Admissions by Party Opponent.
 
 The statement is offered against a party and is ... (B)
 
 a statement of which the party has manifested an adoption or belief in its
 
 truth....”
 

 (Emphasis added.)
 

 In the case now before us, although the evidence indicates that the Landlord Es-toppel Certificate was drafted by attorneys representing Bruno’s with respect to the assignment of its interest in the 1987 lease to the tenant, the record does not contain any evidence that Bruno’s “has manifested an adoption [of the representation that ‘the current term of the Lease is scheduled to expire on May 31, 2008,’] or belief in its truth.” The record does not contain any evidence establishing that Bruno’s gave the Landlord Estoppel Certificate to the tenant or used it in any way. Accordingly, we find no merit in the landlord’s argument that the Landlord Estop-pel Certificate established a genuine issue of material fact regarding whether Bruno’s had exercised its option to extend the 1987 lease.
 

 Accordingly, we affirm the judgment of the trial court.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.
 

 MOORE, J., concurs in the result, without writing.
 

 [1]
 

 . The landlord also sued Bruno's Supermarkets, Inc. ("Supermarkets, Inc."), as successor of Bruno’s, Inc., stating a claim that Supermarkets, Inc. was also liable for the tenant's breach of the 1987 lease. However, Supermarkets, Inc. had been succeeded by Bruno's Supermarkets, LLC (“Supermarkets, LLC"), and the landlord amended its complaint to substitute Supermarkets, LLC as a defendant in place of Supermarkets, Inc. Thereafter, Supermarkets, LLC filed a Chapter 11 bankruptcy petition, and the trial court dismissed the landlord’s claim against Supermarkets, LLC without prejudice.